# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: January 17, 2018

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * | | |
| JUANA OLGA DURAND *as personal* | * | |
| *representative of the Estate of Jorge* | * | PUBLISHED |
| *Antonio Durand*, | * | |
| | * | No. 15-1153V |
| Petitioner, | * | |
| v. | * | Special Master Gowen |
| | * | |
| SECRETARY OF HEALTH | * | Influenza ("Flu") Vaccine; |
| AND HUMAN SERVICES, | * | Guillain-Barré Syndrome ("GBS"); |
| | * | Ruling on Onset. |
| Respondent. | * | |
| * * * * * * * * * * * * * * * * * | | |

Leah V. Durant, Law Offices of Leah V. Durant, PLLC, Washington, D.C., for petitioner.
Claudia B. Gangi, United States Department of Justice, Washington, D.C., for respondent.

## RULING ON ONSET[1]

On October 8, 2015, Juana Olga Durand ("petitioner"), as personal representative of the estate of her husband Jorge Antonio Durand, filed a petition under the National Vaccine Injury Compensation Program (the "Vaccine Act" or the "Vaccine Program").[2] Petitioner alleges that Mr. Durand received an influenza ("flu") vaccine on September 10, 2013, which actually caused Mr. Durand's development of Guillain-Barré Syndrome ("GBS").

There are no contemporaneous records of medical treatment between the vaccination on September 10, 2013, and Mr. Durand's presentation to the emergency room at Wellington Regional Medical Center ("WRMC") on January 5, 2013. The hospital records contain varying histories of his condition: several obtained from Mr. Durand before he was intubated on January 6, 2013; and several that were subsequently obtained from his wife and his daughter. On

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), **because this ruling contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.** The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. Before the ruling is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version of the decision." *Id.* **If neither party files a motion for redaction within 14 days, the ruling will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012). All citations in this decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

1

respondent's motion, a hearing to determine onset of Mr. Durand's symptoms was held on November 2, 2017, and December 5, 2017. Transcript ("Tr.") (ECF Nos. 55, 61). At the conclusion of the hearing, I ruled that Mr. Durand began experiencing weakness in his lower extremities on or around October 20, 2013. Tr. 178. This order memorializes my bench ruling.[3]

### I. Legal Standards Regarding Fact Finding

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records, which are required to be filed with the petition. §11(c)(2). The Federal Circuit has made clear that medical records "warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528. Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras*, 993 F.2d at 1528.

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19.

The Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (*citing Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion

---

[3] Pursuant to Section 300aa–13(a)(1), in order to reach my decision, I have considered the entire record including all of the medical records, statements, expert reports, and medical literature submitted by the parties. This decision discusses the elements of the record I found most relevant to the outcome.

to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## II.     Summary and Discussion of Evidence Submitted

I have reviewed and considered all of the medical records filed.  This includes the medical records predating the vaccine administration, as they provide reliable evidence of Mr. Durand's preexisting conditions and how often he sought medical care.

### A.  Medical Records Predating the Flu Vaccine on September 10, 2013

Mr. Durand had a history of diabetes, hypertension, and cataracts.  On January 30, 2011, he presented to the Wellington Regional Medical Center ("WRMC") emergency room and was discharged with a diagnosis of Bell's Palsy.  Pet. Ex. 4 at 2-3.  At a follow-up appointment, his primary care provider recorded that Mr. Durand had a history of Bell's Palsy approximately twelve years ago (in 1999).  His current complaints were of numbness and difficulty closing the eye on the left side of his face.  He was recorded to have no headache and "no numbness, tingling, or weakness of the extremities."  Pet. Ex. 5 at 18.

On June 14, 2011, Mr. Durand returned to the primary care provider, complaining of numbness and blurry vision on the right side of the face.  He was sent directly to a neurologist and also referred to an ophthalmologist.  He was also "advised to go directly to the emergency room for CT head, [but he] refused."  Pet. Ex. 5 at 12-13.

Mr. Durand had endoscopies in October 2011 and in December 2011.  Pet. Ex. 4.  He went to his primary care provider for chest congestion on February 18, 2012 and for a kidney stone on April 16, 2012.  Pet. Ex. 5011.

On January 12, 2013, Ms. Omarcia Arcia recorded that she gave Mr. Durand a facial; electrostimulation on his left side; and a full body massage.  Pet. Ex. 16 at 1.[4]  On June 5, 2013, Mr. Durand went to an ophthalmologist complaining of a one-week history of "black spots" in his left eye.  Pet. Ex. 2 at 18.  Scans of his retinal and optical nerves were taken.  *Id.* at 19-24.  On June 12, 2013, Mr. Durand returned to the ophthalmologist.  Pet. Ex. 2 at 25-28.

On June 20, 2013, Mr. Durand had a follow-up appointment for hypertension with an internal medicine and cardiology specialist.  He was told to follow up in six months.  Pet. Ex. 17 at 7-10.  Mr. Durand had an endoscopy on June 28, 2013.  Pet. Ex. 4 at 7-16; Pet. Ex. 18.  On July 27, 2013, Ms. Omarcia Arcia recorded that she gave Mr. Durand a facial.  Pet. Ex. 16 at 2.

On August 15, 2013, the ophthalmologist recorded Mr. Durand's complaints that "two days ago, when he woke up, had horizontal diplopia for dv(distance vision) only.  Gets better if he covers either eye… patient feels od (right eye) is the problem."  The ophthalmologist's assessment and plan are essentially illegible.  Pet. Ex. 2 at 29.

---

[4] As detailed below, Ms. Arcia testified that she holds two licenses from the Florida College of Natural Health.  She used to operate a spa.  She currently provides facials, massages, and other treatments out of her home.  Tr. 135-36.

On August 27, 2013, the ophthalmologist recorded Mr. Durand's complaints of "double VA [visual acuity] since Aug. 15, [patient] covered his (R) eye lense to drive since Saturday… no double va when he covers one eye. Pt reports that before he got the double va he had like a hard pain (R) side of face and his tongue got swollen." The assessment was right sixth nerve palsy and diabetes. The plan included controlling "bg/ bp/ cholesterol." They discussed observation, prism, patching one eye, and if there was no improvement after 6 months, to consider surgery. Pet. Ex. 2 at 30.

On September 10, 2013, the internal medicine and cardiology specialist saw Mr. Durand for a follow-up of headaches and palpitations. Pet. Ex. 17 at 2-5. The doctor also filled out a form related to a workplace injury that took place in 2004. The form provides that Mr. Durand had "no functional limitations and restrictions." Pet. Ex. 21. Also on September 10, 2013, Mr. Durand received the flu vaccine at his pharmacy. Pet. Ex. 1.

### B. Medical Records Following Hospitalization on January 5, 2014

There are no contemporaneous medical records between the vaccination on September 10, 2013, and his presentation at the WRMC emergency room on January 5, 2014.

On January 5, 2014, Mr. Durand and his wife presented to the WRMC emergency room. A triage nurse and several doctors recorded that Mr. Durand had a one-day history of numbness and tingling in his legs and/ or arms. Pet. Ex. 7 at 264, 267, 285. Mr. Durand's condition worsened. He collapsed in the hospital. Within a day of his admission on January 5, 2014, Mr. Durand developed respiratory failure, shortness of breath, and difficulty clearing his secretions. Pet. Ex. 7 at 191. He was intubated until he received a tracheotomy on January 15, 2014. Pet. Ex. 7 at 181. Thus, WRMC records dating from January 6 forward have histories that are either borrowed from the initial records or were taken from his wife and/ or his adult daughter.

A January 6, 2014 record provides that Mr. Durand had a history of diplopia. It also provides that Mr. Durand had been complaining to his family of right facial weakness and numbness "since last Wednesday," when they were in Puerto Rico. Pet. Ex. 7 at 193.[5] Another January 6, 2014, record provides that the "family notes he has had recurrence of numbness and facial droop." Pet. Ex. 7 at 680-81.

A January 12, 2014 record provides the wife's account that Mr. Durand had "developed diplopia a few weeks ago and then has had some progressive numbness and tingling and then developed weakness." Pet. Ex. 7 at 189. Another January 12, 2014, record provides that "around September," Mr. Durand started developing double vision, for which he was seeing an eye doctor but no further history was known. Pet. Ex. 7 at 187.

A January 15, 2014, record provides that Mr. Durand had diplopia "2 months prior to admission." Pet. Ex. 7 at 187.

---

[5] Another record provides that Mr. Durand "was in Peru and may have eaten foods that are not within his normal diet." Pet. Ex. 7 at 681. There is no indication that Mr. Durand traveled to Peru.

4

A January 17, 2014, history provides that Mr. Durand had exhibited dysarthria for "many months." But the impression provides that he had a history of "recent travel to PR (ate different foods, per daughter), then diplopia/ dysarthria." Pet. Ex. 7 at 175-79.

Following his hospitalization, Mr. Durand was diagnosed with GBS. His condition worsened, he was transferred to different hospitals, and he passed away. The death certificate attributes his death to GBS.

### C. Testimony Re: Intervening Time Period

On November 2, 2017, I convened a fact hearing to obtain testimony from Mr. Durand's wife Ms. Juana Olga Durand (petitioner in this matter); his adult daughter Ms. Rosa Durand Alcazar; his granddaughter Ms. Alicia Cuba; and his close friend and massage therapist Ms. Omarcia Arcia. Several of the witnesses testified that Mr. Durand – a retired corrections officer – had been working full time as a bailiff for Circuit Court Judge Jose Fernandez in Miami, Florida until just before his hospitalization. The parties and I agreed that the Judge could be a helpful witness as Mr. Durand had worked with him for years. At the conclusion of the proceedings in Florida and in the presence of counsel, I contacted Judge Hernandez's chambers and inquired whether he would be willing to provide fact testimony in this case. Judge Hernandez referred my inquiry to the court's legal counsel, who indicated that a subpoena was necessary. After I authorized petitioner's counsel to serve the subpoena, the court's legal counsel approved Judge Hernandez's testimony. Judge Hernandez testified via videoconference on December 5, 2017. The following section summarizes the testimony from all fact witnesses.

Several of the witnesses testified that prior to receiving the vaccine on September 10, 2013, Mr. Durand had certain medical issues including diabetes and Bell's Palsy but was generally healthy.

Ms. Arcia testified that she first met Mr. Durand in 1976. After she was licensed by the Florida College of Natural Health in 1998, she opened a day spa. She frequently provided Mr. Durand treatments, including massage therapy and facials. Beginning in 2011, she treated his Bell's Palsy with electrostimulation treatments (either with a TENS unit or ultrasound). She also suggested that Mr. Durand purchase a TENS unit and apply it to his own face. Tr. 135-36.

Mr. Durand was involved in various activities including judo, various charity walks, and was very active in the state Police Benevolent Association ("PBA"). He was a retired corrections officer. He was working full time as a bailiff for Judge Hernandez in Miami, Florida. Mr. Durand and his wife had an apartment in Miami during the week. On the weekends, they went home to West Palm Beach, Florida. *See, e.g.*, Tr. 6-9.

In late June or early July 2013, Mr. Durand attended his granddaughter's high school graduation. His wife, his daughter, and his granddaughter all recalled that Mr. Durand was in good health. He was able to climb the stairs of the auditorium, observe the graduation, and go to dinner afterwards with the family. Tr. 53-54; 82; 141-42.

The witnesses did not offer any specific recollections of Mr. Durand's condition in July or August 2013.  Mr. Durand received the flu vaccine on September 10, 2013, which was a Tuesday.

Mr. Durand's daughter, Ms. Rosa Durand-Alcazar, who is also a police officer, recalled that she received a phone call from Mr. Durand while he was driving from Miami (where he worked) to West Palm Beach (where he resided on the weekends).  She recalled that Mr. Durand sounded short of breath.  She asked him what was going on.  He responded that he had aches and pains.  He then said he was losing vision in his right eye and he needed to hang up in order to concentrate on the road.  The daughter believed this call was the weekend after the vaccination, which was the weekend of September 15, 2013.  Tr. 76-77; 102-04.

I do not question the sincerity of Ms. Alcazar's memory.  However, her placement of these symptoms and this call in September 2013 appears to conflict with the medical records.  On August 15, 2013, Mr. Durand reported a two-day history of diplopia to his ophthalmologist. Pet. Ex. 2 at 29.  On August 27, 2013, the ophthalmologist recorded that Mr. Durand complained of "double va [visual acuity] since Aug. 15" and that he "covered his (R) eye lense to drive since Saturday… no double va when he covers one eye."  Pet Ex. 2 at 30.

I asked Ms. Alcazar about how her recollections mirrored the August 2013 records.  However, she maintained that she remembered Mr. Durand experiencing double vision while driving the weekend after the flu vaccine in September 2013.  She suggested that Mr. Durand may have pulled off the road and gone to urgent care or somewhere closer than his regular ophthalmologist.  Tr. 87-94.  Following the fact hearing, I ordered petitioner's counsel to locate and file any outstanding records.  Petitioner's counsel contacted Mr. Durand's insurance provider, but they were not billed for any ophthalmology or other medical care during this time period.  Tr. 175.

I can accept that Ms. Alcazar has drawn an association between the phone call from her father and the flu vaccine.  These events are close in time.  However, her description of her father experiencing blurry vision while driving is highly consistent with two contemporaneous ophthalmology records placing those events in August.  There is no suggestion that those records are incorrectly dated.  Moreover, there are no medical records or additional evidence corroborating Ms. Alcazar's memory that Mr. Durand experienced blurry vision while driving on a separate occasion in September.  Thus, I do not find her testimony is sufficiently "consistent, clear, cogent, and compelling" to outweigh the contemporaneous medical records.  *Camery*, 42 Fed. Cl. at 391 (internal citations omitted); *see also Burns*, 3 F.3d at 417 (holding that the special master can make a rational determination to afford greater weight to contemporaneous medical records than to other evidence, such as testimony given later in time).

Ms. Alcazar also recalled that later in September 2013, she and Mr. Durand went to breakfast and then observed the feast day of St. Michael, the patron saint of police officers, at St. Patrick's Catholic Church in Miami. This was a particularly memorable event both to Ms. Alcazar and to Judge Hernandez as it was an annual Mass for police officers and Mr. Durand had been very active in various police associations for many years.  Uncharacteristically on this occasion, Mr. Durand did not want to drive because he had tingling in his left hand so Ms.

Alcazar drove them both.  She also had to help Mr. Durand out of the car because his hip was hurting.  Tr. 78-79, 102-105.  I generally find this testimony to be credible, insofar as it is tied to a specific event and does not conflict with other evidence submitted.

      Ms. Arcia recalled an appointment with Mr. Durand on September 20, 2013.  That day in her appointment book provides: "George facial treatment.  Elect. stimulation.  Tingling on lf side of face.  Weakness of muscles."  Pet. Ex. 16 at 3.  She testified that Mr. Durand called in advance for a facial.  When he arrived, the left side of his face was drooping. Ms. Arcia believed this resembled the Bell's Palsy he'd had in the past.  However, there were several differences: she felt his face to be cold; his complexion was grey in color; he looked weak; and he complained that his face was tingling; and he complained that his body ached.  These symptoms seemed new.  Tr. 129-36.  I find that her testimony, as to these facts was credible.  It will be for the experts to address whether these symptoms could have represented a recurrence of Bell's Palsy or whether given the differences she described whether they could have been early symptoms of GBS.

      Mrs. Durand testified that after receiving the vaccine, Mr. Durand developed headaches, weakness, and tingling in his legs and arms.  He also began having problems talking, facial weakness, and drooping on the left side of his face.  He began putting his TENS unit on his face to relieve the pain.  His vision became blurry and he had to place strips on his glasses.  Pet. Ex. 12 at 1; Tr. 61.  He initially asked Mrs. Durand to massage him, but by "the end of September," he didn't want massages anymore because he was too tense.  Tr. 63-64.  "By the end of October," he started having sexual problems.  His joints and calves started to experience a lot of cramping.  Pet. Ex. 12 at 1.

      Mrs. Durand stated that these events happened after Mr. Durand received the vaccine on September 10, 2013, and that they occurred during the months of September and October.  She remembered the timing because every year during this time, "starting in the middle of September" – she and Mr. Durand would begin preparing for his three children's birthdays (in late October, mid-November, and late November), Thanksgiving, and Christmas.  They would buy gifts in advance and celebrate with their children on each occasion.  Tr. 34.  But in fall 2013, Mr. Durand could not follow their regular routine.  He couldn't walk because his legs were tense, tingling, and painful.  He also had headaches.  Tr. 10.  Mrs. Durand couldn't remember any details about the first daughter's birthday in late October.  She did recall that for the second daughter's birthday in early November, they did not buy any gifts and they did not go out to a restaurant.  Mr. Durand had a terrible, constant headache the whole day.  The daughter, Ms. Alcazar, just visited Mr. Durand at his home on her birthday.  Tr. 35-36, 68; *see also* Tr. 80-81, 102-05 (that daughter's testimony).

      Mrs. Durand recalled that throughout November and December, Mr. Durand had increased difficulty walking up and down stairs; more severe headaches; and increased pain, tingling, and numbness.  Pet. Ex. 12 at 1.  She and Mr. Durand did not leave the house on Thanksgiving or on Christmas Eve.  Tr. 43-45; *see also* Tr. 110 (daughter's testimony that on Christmas Day, Mr. Durand came to her house only briefly, and complained about his pain).

Mr. Durand and his wife traveled from Florida to Puerto Rico December 26, 2013 to January 3, 2014. Pet. Ex. 12 at 1. Mrs. Durand testified that Mr. Durand did not want to go, but he felt obligated because it was a celebration for his brother's birthday and retirement. Tr. 42-43. According to Mrs. Durand, Mr. Durand was in constant pain and fatigue during the trip. Pet. Ex. 12 at 1-2; Tr. 43-44. When they returned on January 3, 2014, Mr. Durand had a high fever with increased weakness in both arms. He had lost his appetite. On January 4, 2014, he still had a high fever with body aches and numbness in both arms and legs. Pet. Ex. 12 at 1-2. He thought it might be symptoms of a cold or a flu. Tr. 46. He mentioned that if the symptoms continued on Sunday, he was going to the hospital. He took over the counter medications like Tylenol and Aleve but they did not help his pain. Pet. Ex. 12 at 2. On January 5, 2014, when Mr. Durand woke up, he was in such pain that he and Mrs. Durand decided to go to the hospital. That day, he was admitted and placed in the intensive care unit. Pet. Ex. 12 at 2. The following day, he was intubated.

Mrs. Durand stated several times that Mr. Durand did not seek medical attention for every issue he experienced. Neither did he complain to others. He was reserved and private. Pet. Ex. 12 at 1; Tr. 13, 27. But if he did go to any doctors between receiving the vaccine on September 10, 2013, and being hospitalized on January 5, 2014, he did not tell her about it. Tr. 28.

Mrs. Durand also stated that Mr. Durand's presentation to the hospital and his rapid decline were sudden and stressful. Within a day, he was unable to speak. She tried to communicate with the various doctors who saw him. She tried to explain that he had diabetes and other preexisting issues, but that this was worse. This was difficult for her. Tr. 65.

I found Mrs. Durand to be fairly credible. While recognizing that she is the petitioner bringing this claim and has a vested interest, she did her best to focus on the time in question and relate her memories to specific events. She stated that Mr. Durand began experiencing problems in September or in October. However, she was not particularly specific. She could not remember any details prior to the first child's birthday being at the end of October. I find it most plausible that these problems began at some point in the middle or towards the end of October, close in time to the birthdays and the holidays.

Mrs. Durand's testimony regarding Mr. Durand's hospitalization is also fairly compelling. The records reflect that Mr. Durand contributed to his history for the initial medical records, but his condition rapidly worsened and he was intubated by the end of the first day. I am persuaded that it was likely difficult for Mr. Durand and his wife (and later, his daughter) to fully explain his history to the various doctors. This is informed by my review of the facts laid out in the medical records, as well as my observations of Mrs. Durand's testimony.

I was most persuaded by the testimony from Judge Hernandez. He testified that Mr. Durand became his bailiff in January 2007. In this role, Mr. Durand prepared the judge's calendar, walked him in and out of court, maintained security, escorted participants in and out of the courtroom, and was essentially the judge's right hand. Tr. 155. It was apparent that Mr. Durand was more than Judge Hernandez's bailiff, but had become a close friend over these years. They usually attended the St. Michael's Day Mass together each year and they had lunch

together on most work days. Judge Hernandez said that he finds it difficult to return to the restaurant where he regularly went with Mr. Durand.

Judge Hernandez recalled that in approximately February 2013, he (assisted by Mr. Durand) was assigned to a three-year term doing "back up" at the court. This entailed "run[ning] around" and covering two to three courtrooms in different parts of the building each day. The judge said this was "hectic." Tr. 160-61.

The Judge testified that Mr. Durand preferred to take the stairs rather than the elevator because the stairs were less open to the public, safer, and quicker. That is how they would travel to the Judge's own chambers on the seventh floor and the other courtrooms they covered. The Judge was always surprised by Mr. Durand's ability to climb the stairs better than he could himself. Tr. 156-57, 160, 169. At some point, Mr. Durand began to complain that his legs felt "wobbly" and "unstable." Tr. 156. As a consequence, Judge Hernandez and Mr. Durand started taking the stairs less and instead took the elevators and escalators. The Judge did not recall the exact timing, other than it was during the "back up" term that began in February 2013 and "near the end" of Mr. Durand working with him. Tr. 164-65. Judge Hernandez also said the issues began "several months" or "a few months" before Mr. Durand's last day of employment, which was a few days before Christmas 2013. Tr. 164-66, 172. Judge Hernandez did recall that they began taking the private judge's elevator because Mr. Durand could no longer take the stairs during this same time period. Tr. 165-166.

Judge Hernandez also recalled that that "shortly before the Christmas break," Mr. Durand brought in a man he wanted to replace him. Mr. Durand told Judge Hernandez, "I don't think I'm going to do this much longer or I can't do this much longer." Tr. 167. The Judge stated that he did not know what Mr. Durand's intentions were. But after Mr. Durand passed away, the Judge hired the man he had brought in. Tr. 168.

I found Judge Hernandez to be credible. He began working with Mr. Durand in 2007, at least six years before the time period at issue here. He knew Mr. Durand and his habits very well. They frequently took the stairs, at work at Mr. Durand's preference. It is certainly credible that Judge Hernandez would have a clear recollection of Mr. Durand not wanting to take the stairs any longer when this was a regular part of their daily routine.

While the Judge was testifying about events several years prior, he gave his best estimates and admitted what he did not recall. Additionally, he did not hear any other witnesses' testimony, he did not prepare an affidavit, he only testified upon receiving a subpoena to do so.

I find that the Judge's testimony and Mrs. Durand's testimony both support that Mr. Durand began experiencing fatigue and sensory issues in his lower extremities approximately two months before Mr. Durand left for the Christmas break, in the middle to latter part of October 2013, placed approximately at October 20, 2013. It is possible that some of his symptoms may have begun in September, as referenced by Mrs. Durand and as Ms. Alcazar testified about the St. Michael's Day Mass.

### III.     Conclusion

I have carefully reviewed the record.  Consistent with the foregoing, I find that the record does not support that Mr. Durand experienced double vision a few days after the vaccination on September 10, 2013.  I find that Mr. Durand developed facial droop, numbness and tingling in later September 2013.  While these symptoms bear some resemblance to his earlier episodes of Bell's Palsy, the experts will have to opine whether they could have been early symptoms of his GBS.  I further find that Mr. Durand began experiencing fatigue as well as weakness in his legs in the middle to latter part of October, on or around October 20, 2013.  This date represents approximately two months before Mr. Durand's last day working with Judge Hernandez before the Christmas break.

The following is **ORDERED:**

1) Each party shall provide a copy of this fact ruling to any expert witness retained in the case.  Each expert must rely on the facts as I have found them in this ruling.  No expert shall rely on the daughter's testimony providing that Mr. Durand experienced blurry vision within a week of the flu vaccine, or any medical records that repeat that account.

2) Petitioner shall file an expert report **within 60 days, by Monday, March 19, 2018**.

3) Respondent shall file a responsive expert report and his Rule 4(c) report **within 60 days thereafter**.

**IT IS SO ORDERED.**

**s/Thomas L. Gowen**
Thomas L. Gowen
Special Master